UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL ERB,

                Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

14-CV-6258P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Michael Erb ("Erb") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income Benefits ("SSI").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 8).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 9, 11).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.     Procedural Background

Erb protectively filed for SSI on March 22, 2012, alleging disability beginning on February 4, 2011, due to bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), marijuana abuse, and nicotine addiction.  (Tr. 166, 180).[1]  On June 4, 2012, the Social Security Administration denied Erb's claim for benefits, finding that he was not disabled.  (Tr. 88).  Erb requested and was granted a hearing before Administrative Law Judge James G. Myles (the "ALJ").  (Tr. 67, 97, 116-20).  The ALJ conducted a hearing on March 20, 2013.  (Tr. 67-87).  In a decision dated March 22, 2013, the ALJ found that Erb was not disabled and was not entitled to benefits.  (Tr. 19-27).

On April 24, 2014, the Appeals Council denied Erb's request for review of the ALJ's decision.  (Tr. 1-6).  In the denial, the Appeals Council considered a Drug/Alcohol evaluation submitted by Kang Yu ("Yu"), MD, dated May 3, 2013, but declined to consider a letter submitted by Yu dated March 28, 2014.  (Tr. 2).  Erb commenced this action on May 16, 2014 seeking review of the Commissioner's decision.  (Docket # 1).

### II.     Relevant Medical Evidence[2]

#### A.     Treatment Records

##### 1.     Genesee Hospital

On October 16, 1986, Max W. Steiner ("Steiner"), MD, conducted a pediatric neurodevelopmental evaluation of Erb.  (Tr. 226-32).  Erb, who was then approximately eight years old, was referred for evaluation due to his classroom behavior.  (*Id.*).  According to Steiner,

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

intelligence testing conducted in April 1986 revealed that Erb had a verbal intelligence quotient ("IQ") of 97, performance IQ of 86 and a full-scale IQ of 91. (*Id.*). Projective testing and classroom observation suggested that Erb suffered from behavioral problems with a tendency to disrupt the classroom. (*Id.*). According to Steiner, Erb's behavior was fidgety and impulsive and he demonstrated a decreased attention span. (*Id.*).

### 2. School Psychologist

James F. Elkin ("Elkin"), a school psychologist, conducted a psychological evaluation of Erb in January 1992 when he was in the eighth grade. (Tr. 234-39). Elkin reviewed Erb's educational records, including previous intelligence testing. (*Id.*). Elkin administered the Wechsler Intelligence Scale for Children – Revised ("WISC-R") to Erb. (*Id.*). Erb demonstrated a verbal IQ score of 85, a performance IQ score of 86 and a full-scale IQ score of 84. (*Id.*). Elkin also administered the Woodcock-Johnson Psycho-Educational Battery to Erb. (*Id.*). This test indicated that Erb demonstrated average proficiency in reading, below average proficiency in general knowledge, moderate deficiency in written language, and a severe deficiency in mathematics. (*Id.*). Elkin opined that Erb was uncooperative during testing and that his earlier higher IQ scores were more likely to reflect his level of intellectual functioning. (*Id.*). Elkin also opined that a behavior scale indicated that Erb demonstrated significant behavioral problems towards peers and staff. (*Id.*). Elkin recommended that Erb continue to be classified as an emotionally handicapped student and placed in a structured school setting that emphasized behavior management. (*Id.*).

### 3. Clifton Springs Hospital

Treatment notes indicate that Erb arrived at the emergency department of the Clifton Springs Hospital accompanied by a police officer on January 10, 2011. (Tr. 246-54).

Erb reported that he had felt suicidal that day, although he did not have any definite plans to hurt himself. (*Id.*). He indicated that he was depressed and under stress caused by the mother of his son. (*Id.*). Erb reported previous psychiatric problems, including depression and bipolar disorder, and that he had previously received treatment at Elmira Mental Health. (*Id.*). The clinical impression included major depression, manipulative personality, and suicidal ideation. (*Id.*). Erb was admitted for a psychiatric evaluation. (*Id.*).

Erb reported mental difficulties stemming from an ongoing custody battle with the mother of his eight-year-old son. (*Id.*). Erb had reported to his landlord that he was "at the end of his rope," which prompted his landlord to call the police, who escorted Erb to the emergency department. (*Id.*). Erb presented as controlled and cooperative, but irritable about being at the hospital. (*Id.*). The doctor opined that Erb was responding to a situational stressor and his conduct suggested a potential personality disorder, but he was not suicidal or homicidal and did not demonstrate any other mental illness that required hospitalization. (*Id.*). He opined that Erb would benefit from further treatment and diagnosed him with adjustment disorder and personality disorder and assigned a Global Assessment of Functioning ("GAF") of 60. (*Id.*). Erb was discharged on January 11, 2011 and instructed to follow up for mental health treatment. (*Id.*).

### 4. Elmira Psychiatric Center

Treatment records indicate that Yu conducted a mental health evaluation of Erb at Elmira Psychiatric Center on February 11 and 18, 2011. (Tr. 288-90, 292). Erb reported a previous suicide attempt while he had been incarcerated, as well as a history of violent behavior. (*Id.*). He denied current suicidal or homicidal ideations. (*Id.*). Erb reported long-standing

difficulties controlling his anger, which had resulted in several arrests, as well as fluctuations in mood ranging from depression to a mixed state with dysphoric mania.  (*Id.*).

Erb had previously been treated for ADHD when he was a teenager and had received anger management treatment.  (*Id.*).  According to Erb, he had been prescribed Seroquel and Paxil.  (*Id.*).  Erb reported that he had been physically abused while living with relatives.  (*Id.*).  He also reported a significant history of alcohol and marijuana abuse, and a history of domestic violence between his parents.  (*Id.*).

Upon examination, Erb presented as neatly dressed and groomed.  (*Id.*).  He demonstrated good eye contact, cooperative and friendly attitude, relevant and coherent speech, no evidence of hallucinations or delusions, some evidence of paranoid tendency, broad affect, neutral mood, full orientation, intact memory, and fair judgment.  (*Id.*).  Yu noted that Erb's speech had been accelerated and loud during his previous visit, but appeared more normal during the evaluation, which Yu attributed to Erb's treatment with Zyprexa.  (*Id.*).  Additionally, Yu noted an improved mood and affect compared to the previous week's visit.  (*Id.*).  Yu opined that Erb's intellectual functioning and general fund of knowledge were average, and indeed higher than expected given Erb's failure to complete high school as a result of his expulsion for behavioral problems.  (*Id.*).  Erb was able to complete his serial 7's "very fast and accurately," and, with some prompting, was able to identify past presidents in sequence and to identify the biggest and most populous states.  (*Id.*).

Yu diagnosed Erb with bipolar disorder, not otherwise specified, ADHD, not otherwise specified, alcohol abuse, and cannabis abuse, and assessed a GAF of 62.  (*Id.*).  Yu increased Erb's Zyprexa dosage and recommended that Erb continue to meet regularly with his therapist and social worker, Richard Underwood ("Underwood").  (*Id.*).

On November 30, 2011, Underwood sent a letter to Jeffrey R. Harper, Esq., in response to a request for medical records. (Tr. 292). In the letter, Underwood stated that Erb had been admitted for treatment at Elmira Psychiatric Center on February 4, 2011 and had been evaluated by Yu on February 11 and 18, 2011. (*Id.*). Underwood reported that Erb's attendance at scheduled appointments was inconsistent and that he had not been seen by Yu since August 1, 2011, or by Underwood since October 26, 2011. (*Id.*). Underwood had no current contact information for Erb and planned to close his case if he did not hear from Erb before December 12, 2011. (*Id.*).

Underwood opined that Erb was unable to sustain employment due to his limited insight into his long-standing psychiatric issues and the manner in which those issues affected his functioning. (*Id.*). Additionally, Erb's continued use of marijuana and alcohol impeded his functioning. (*Id.*). According to Underwood, Erb was unlikely to have sustained employment success without treatment, although he was likely to improve with consistent treatment. (*Id.*).

Treatment notes indicate that Erb returned to Yu on January 20, January 27 and February 10, 2012. (Tr. 293-95). Yu reported that he had initially prescribed Zyprexa, which Erb took between February and March 2011, but Erb had complained of excessive sedation. (*Id.*). According to Yu, because Erb had failed to attend appointments, he was not prescribed any medication until January 2012, when he was prescribed Seroquel. (*Id.*). According to Yu, Erb discontinued Seroquel after two days due to reported grogginess. (*Id.*). On January 27, 2012, Yu prescribed Clonazepam, which Erb reported made him feel calmer and in better control of his anger. (*Id.*).

According to Yu, Erb's attendance at scheduled appointments with both Yu and Underwood had been sporadic over the prior year. (*Id.*). Although Erb reported that he had

worked the previous year, Yu indicated that Erb did not have steady employment, but worked irregularly when work was available. (*Id.*). During the previous year, Erb had been working with an attorney to assist him in obtaining SSI benefits. (*Id.*).

Upon examination, Erb presented with a neat appearance and good hygiene. (*Id.*). He demonstrated a cooperative and friendly attitude, normal behavior, good eye contact, relevant but accelerated speech with a slightly elevated volume, no evidence of hallucinations or delusions, although he demonstrated suspiciousness of others, broad affect with a pleasant mood, full orientation, alert and conscious sensorium, fairly intact memory, superficial insight, and impaired judgment. (*Id.*). Yu opined that Erb demonstrated below average intellectual functioning and fund of general knowledge, which he attributed to Erb's failure to finish high school due to his expulsion in the twelfth grade. (*Id.*). According to Yu, Erb was able to perform serial 7's correctly, although slowly. (*Id.*). Yu assessed Erb's GAF to be 59 and recommended that he continue taking Clonazepam. (*Id.*).

On May 25, 2012, Underwood reviewed Erb's treatment progress. (Tr. 298-304). According to Underwood, Erb had failed to attend two of the three scheduled appointments with Yu during the previous three months. (*Id.*). Erb was seen by Yu on March 2, 2012 and reported that his medications had been helpful and had assisted him in controlling his anger and decreasing his mood fluctuations. (*Id.*). Erb had attended five therapy sessions with Underwood during March and April, but none in May. (*Id.*). Erb had reported that he was abstaining from marijuana and only occasionally consuming alcohol. (*Id.*). Erb continued to seek SSI benefits and expressed frustration over the process. (*Id.*).

B.    **Medical Opinion Evidence**

1.    **Christina Caldwell, PsyD**

On May 23, 2012, state examiner Christina Caldwell ("Caldwell"), PsyD, conducted a consultative psychiatric evaluation of Erb. (Tr. 266-69). Erb reported that he had driven himself approximately forty miles to the evaluation. (*Id.*). Erb also reported that he lived with his girlfriend. (*Id.*). He reported that he had been in special education classes in school due to behavioral problems and had dropped out of high school in the twelfth grade. (*Id.*). Erb was not currently employed and reported previous employment at a shopping center. (*Id.*). According to Erb, he had worked at the shopping center for approximately three weeks before being fired. (*Id.*). Erb reported that he was unable to work due to mental instability. (*Id.*).

According to Erb, he had been hospitalized for one day in January 2012 at Clifton Springs Hospital due to a "mental breakdown." (*Id.*). He also reported previous treatment at the Elmira Psychiatric Center off and on since 1990. (*Id.*). Erb reported that he had been seeing Yu weekly or monthly since January 2011. (*Id.*). Erb reported difficulty falling asleep and increased appetite. (*Id.*). He complained of psychiatric problems indicated by dysphoric moods, psychomotor retardation, loss of usual interest, fatigue, loss of energy, diminished self-esteem, diminished sense of pleasure and social withdrawal. (*Id.*).

He also reported excessive apprehension and worry, irritability, restlessness, difficulty concentrating, and muscle tension. (*Id.*). According to Erb, he suffered from daily panic attacks causing symptoms of palpitations, nausea, sweating, breathing difficulties, and trembling. (*Id.*). Erb reported that his depression and anxiety were equally debilitating and also complained of short-term memory deficits and difficulties with word finding, planning, and organizing. (*Id.*). Erb indicated that he had a history of previous marijuana use until

approximately September 2011 and currently consumed approximately six alcoholic beverages twice a week. (*Id.*). Erb reported prior arrests for obstruction of governmental administration, harassment, criminal contempt, and violation of orders of protection. (*Id.*).

Erb reported that he did not have difficulties cooking, cleaning, washing laundry, driving, taking public transportation, or caring for his personal hygiene on a day-to-day basis. (*Id.*). He reported that his anxiety prevented him from shopping. (*Id.*). According to Erb, he sometimes socialized with acquaintances, but found it difficult to be around other people, and generally preferred to stay home. (*Id.*). He reported a good relationship with his girlfriend and his son. (*Id.*). His hobbies included watching television and using the computer. (*Id.*).

Upon examination, Caldwell noted that Erb appeared casually dressed and well-groomed. (*Id.*). Caldwell opined that Erb had fluent and pressured speech with adequate language, coherent and goal-directed thought processes, agitated affect, irritable mood, clear sensorium, full orientation, fair to poor insight, fair to poor judgment, and average intellectual functioning with a general fund of information that was appropriate to his experience. (*Id.*). Caldwell noted that Erb's attention and concentration were intact. (*Id.*). According to Caldwell, Erb completed the serial 3's without mistake. (*Id.*). Erb's memory skills were intact. (*Id.*). According to Caldwell, Erb could recall three objects immediately, but could not recall the objects after a delay. (*Id.*). Further, Erb was able to repeat six digits forward and four backward. (*Id.*). Caldwell reported that Erb's demeanor during the evaluation was irritable and his manner of relating, social skills, and overall presentation were poor. (*Id.*). According to Caldwell, Erb appeared very agitated throughout the evaluation. (*Id.*).

According to Caldwell, Erb could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain

a regular schedule, and learn new tasks.  (*Id.*).  Caldwell opined that Erb's ability to perform

complex tasks independently, make appropriate decisions, relate adequately with others, and

appropriately deal with stress were limited due to his depressive disorder, anxiety disorder, and

panic disorder.  (*Id.*).  According to Caldwell, the results of her evaluation appeared consistent

with Erb's report to her.  (*Id.*).  Caldwell opined that Erb's prognosis was fair to guarded with

continued psychological and psychiatric intervention.  (*Id.*).

## 2.    **E. Kamin, Psychology**

On June 4, 2012, agency medical consultant E. Kamin ("Kamin"), MD,

completed a Psychiatric Review Technique.  (Tr. 270-83).  Kamin concluded that Erb's mental

impairments did not meet or equal a listed impairment.  (Tr. 270, 273, 275).  According to

Kamin, Erb suffered from mild limitations in his activities of daily living and moderate

limitations in his ability to maintain social functioning and to maintain concentration, persistence

or pace.  (Tr. 280).  According to Kamin, Erb had suffered from one or two episodes of

deterioration.  (*Id.*).  Kamin completed a mental Residual Functional Capacity ("RFC")

assessment.  (Tr. 284-87).  Kamin opined that Erb suffered from moderate limitations in his

ability to work in coordination with or proximity to others without being distracted by them, to

make simple work-related decisions, to complete a normal workday and workweek without

interruptions from psychologically-based symptoms, to interact appropriately with the general

public, to accept instructions and respond appropriately to criticism from supervisors, to get

along with coworkers or peers without distracting them or exhibiting behavioral extremes, to

respond appropriately to changes in a work setting, and to set realistic goals or make plans

independently of others.  (*Id.*).  Kamin repeated Caldwell's opinion that Erb could follow and

understand simple directions and instructions, perform simple tasks independently, maintain

attention and concentration, maintain a regular schedule and learn new tasks, but was limited in his ability to perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress.  (*Id.*).

### 3.     Kang Yu, MD

On January 15, 2013,[3] Yu submitted an evaluation of Erb's mental RFC. (Tr. 307-10).  Yu opined that Erb had a good[4] ability to comprehend and carry out simple instructions and to remember work procedures.  (*Id.*).  Additionally, Yu opined that Erb had a fair[5] ability to remember detailed instructions, respond appropriately to supervisors, function independently, exercise appropriate judgment, concentrate and attend to a task over an eight-hour period, abide by occupational rules and regulations, make simple work-related decisions, maintain social functioning, and be aware of normal hazards.  (*Id.*).  According to Yu, Erb had demonstrated difficulty with interpersonal interactions and had a low frustration tolerance.  (*Id.*). According to Yu, Erb had reported difficulty managing his emotions at work and difficulty maintaining focus.  (*Id.*).

Yu further opined that Erb had a poor[6] ability to respond appropriately to coworkers, complete a normal workday on a sustained basis, and tolerate customary work pressures in a work setting, including production requirements and demands.  (*Id.*).  According to Yu, Erb's low frustration tolerance and difficulty controlling his emotions had resulted in

---

[3]  Yu's opinion is dated January 15, 2012, but the cover letter submitting the evaluation indicates that it should have been dated January 15, 2013.  (Tr. 306, 310).

[4]  "Good" was defined to mean "[t]he ability to function in this area is limited but satisfactory."  (*Id.*).

[5]  "Fair" was defined to mean "[t]he ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times."  (*Id.*).

[6]  "Poor" was defined to mean "no useful ability to function in this area."  (*Id.*).

outbursts and loss of employment. (*Id.*). Further, Yu opined that Erb had an aversion to pressured situations and would not respond well to production requirements and demands. (*Id.*).

According to Yu, Erb was likely to deteriorate under stress. (*Id.*). Yu opined that Erb's conditions were likely to produce good days and bad days and that Erb was likely to be absent from work more than four days per month. (*Id.*). Yu indicated that he had not treated Erb since October 26, 2012. (*Id.*). He also opined that Erb was totally disabled and unable to engage in any competitive employment. (*Id.*).

On May 3, 2013, Yu opined that Erb's impairments would continue even if he were to abstain from consuming alcohol or narcotic drugs. (Tr. 312). Additionally, on March 28, 2014, Yu opined that Erb continued to be totally disabled from any form of competitive employment and that the limitations contained in his January 2012 evaluation continued to exist. (Tr. 9).


III.   **Non-Medical Evidence**

   A.   **Application for Benefits**

   In his application for benefits, Erb reported that he had been born in 1978. (Tr. 166). According to Erb, he had previously been employed as a cashier, cable lineman, cook at a fast food restaurant, a pallet factory worker, a truck washer, a prep cook and a dishwasher. (Tr. 59-66).

   Erb reported that he lived in an apartment with his girlfriend. (Tr. 44-56). He was able to care for his own personal hygiene, but had difficulty sleeping and needed assistance to remember to take his medication. (*Id.*). Erb was able to prepare his own meals and could perform household chores without assistance, including cleaning, laundry and yard work. (*Id.*).

He was able to walk and drive a car for transportation and left home daily. (*Id.*). Erb went shopping once a week and was able to handle his own finances. (*Id.*).

According to Erb, he enjoyed watching television and "RC trucks" and spending time with others several times each week. (*Id.*). Erb reported that he sometimes got nervous around others, but visited his mother, sisters and aunt a few times each week. (*Id.*). He reported difficulty maintaining attention, completing tasks, and following written or spoken instructions. (*Id.*). He also reported difficulty getting along with people in authority and that he had lost employment because he had not followed instructions. (*Id.*). Erb reported that he was severely affected by stress or changes in schedule and had difficulty with his memory. (*Id.*).

Erb reported that he had experienced panic attacks since he was a child and that they had increased in frequency. (*Id.*). According to Erb, his attacks occurred daily, did not have particular triggers, and were indicated by rapid heartbeat and anxious feelings. (*Id.*). The attacks typically lasted one to two hours, during which Erb was able to complete tasks including shopping or driving, but with difficulty. (*Id.*).

B. **Administrative Hearing Testimony**

During the administrative hearing, Erb testified that he had completed the eleventh grade in special education classes. (Tr. 70, 74). Erb testified that he had previously worked at a truck wash, but had lost his employment after failing a urinalysis test. (Tr. 71). Erb testified that he lives with his girlfriend, who drove him to the hearing. (Tr. 73). Erb has a driver's license and is able to drive by himself, although he has difficulty with directions. (*Id.*). Erb testified that he is able to care for his own personal hygiene and complete household chores. (Tr. 73-74). According to Erb, when his mood permits, he generally wakes at about 9:00 a.m., watches the news, and then performs household chores. (Tr. 74).

Erb testified that he suffers from bipolar disorder and other mental impairments that prevent him from working. (Tr. 71-72). Erb's mental impairments affect him daily, although some days are worse than others. (Tr. 74-75). Erb estimated that he has bad days approximately "once or twice a week," during which he does not leave the house or get dressed and is easily agitated. (*Id.*). On those days, his mood may fluctuate from happy to miserable within minutes. (Tr. 75).

Erb testified that he often feels overwhelmed by everyday situations, particularly his inability to see his son. (Tr. 76). He also experiences difficulty with his memory and attention. (Tr. 76-77). According to Erb, he has difficulty finishing tasks and is easily frustrated. (Tr. 77). Additionally, Erb reported difficulty socializing with others. (Tr. 77-78). Erb does not like to go shopping because it requires him to be around other people. (Tr. 79).

According to Erb, he sees his therapist once a week and treats with Yu once every three months. (*Id.*). Erb testified that his current medication is beneficial and produces no side effects. (Tr. 72-73). Before the medication, Erb had difficulty controlling his anger. (Tr. 75-76). Erb reported that he takes Clonazepam when he feels the symptoms of a "hyper" episode coming on. (Tr. 78). Erb experiences these episodes, which last about ten minutes, three to four times each week. (Tr. 79).

Erb's girlfriend, Maria Bonacci ("Bonacci"), also testified during the hearing. (Tr. 80). She testified that she had been living with Erb for approximately two years. (*Id.*). Bonacci testified that Erb needs assistance to complete tasks, often requiring step-by-step instructions. (Tr. 81). Additionally, Erb is easily frustrated, which impedes his ability to complete tasks. (Tr. 81-82). According to Bonacci, Erb has difficulty maintaining attention, although he is able to complete household chores upon request. (Tr. 82). Approximately four

days each week, Erb experiences a low mood. (*Id.*). On those days, he does not get dressed or leave the house. (*Id.*). Bonacci reported that Erb has difficulties with his memory and decision-making and does not get along with many people. (Tr. 82-83).

Vocational expert Abbe May ("May"), M.Ed., also testified during the hearing. (Tr. 83-87, 141). The ALJ noted that Erb did not appear to have performed his previous jobs at a level sufficient to qualify as past relevant work. (Tr. 84). The ALJ asked May whether any jobs would exist for a person who was the same age as Erb, with the same education and vocational profile, and who was able to perform the full range of work at all exertional levels, but who was limited to routine, unskilled, non-quota work, with no more than occasional interpersonal contact when working as part of a team, no public contact as part of the job duties, but could tolerate occasional public contact incidental to job duties. (*Id.*). May opined that such an individual could perform the jobs of groundskeeper, janitorial worker and auto detailer. (Tr. 85). The ALJ asked whether those positions would be available for the same individual if the individual were absent from work three times per month. (*Id.*). May testified that such an individual would not be able to maintain competitive employment. (Tr. 85-86).

Erb's attorney asked May whether an individual would be able to perform any of the previously identified positions if he had no useful ability to relate appropriately with coworkers, to complete a normal workday on a sustained basis, or to tolerate customary work pressures in a work setting. (Tr. 86). May testified that such an individual would not be able to perform the identified positions. (*Id.*).

## C.     **Third-Party Statements**

Bonacci also submitted a statement dated July 9, 2012. (Tr. 199-201). Bonacci indicated that Erb had difficulties with his memory, decision-making, attention span, and ability

to interact with others.  (*Id.*).  According to Bonacci, Erb also suffered from manic depressive cycles and periods of high anxiety.  (*Id.*).  Further, Bonacci stated that Erb was easily frustrated and had difficulty managing stress.  (*Id.*).

Erb's aunt Thelma McGough ("McGough") submitted a statement dated July 24, 2012.  (Tr. 203-05).  McGough indicated that Erb had experienced difficulties since childhood.  (*Id.*).  According to McGough, Erb had difficulty tolerating stress, maintaining attention when distracted, and being around other people without experiencing agitation.  (*Id.*).  Additionally she reported that Erb suffered from an inability to control his anger.  (*Id.*).

Pam Shumway ("Shumway"), Erb's mother, also submitted a statement dated July 30, 2012.  (Tr. 206-08).  Shumway indicated that Erb had a short temper and was easily agitated, which limited his ability to respond to others.  (*Id.*).  According to Shumway, Erb was easily distracted, needed instructions explained to him in detail, and had difficulty making decisions, handling stress, and maintaining attention.  (*Id.*).

## DISCUSSION

### I. Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry*

*v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial
gainful activity;

(2)    if not, whether the claimant has any "severe impairment"
that "significantly limits [the claimant's] physical or mental
ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments
meets or equals one of the impairments listed in Appendix
1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments,
the claimant retains the residual functional capacity to
perform his past work; and

(5)    if not, whether the claimant retains the residual functional
capacity to perform any other work that exists in significant
numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

**A.    The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims. (Tr. 16-27). Under step one of the process, the ALJ found that Erb had not

engaged in substantial gainful activity since March 22, 2012, the application date. (Tr. 21). At

step two, the ALJ concluded that Erb has the severe impairments of bipolar disorder, depression,

anxiety, and substance addiction disorder. (*Id.*). At step three, the ALJ determined that Erb does

not have an impairment (or combination of impairments) that meets or medically equals one of

the listed impairments. (Tr. 21-23). With respect to Erb's mental impairments, the ALJ found that Erb suffered from mild restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence and pace, and social functioning. (*Id.*). The ALJ concluded that Erb has the RFC to perform the full range of work at all exertional levels, but that he was limited to routine, unskilled work that involved only occasional interpersonal contact in the workplace and did not involve extensive contact with the public or working as part of a team. (Tr. 23). At step four, the ALJ determined that Erb had no past relevant work. (Tr. 26). Finally, at step five, the ALJ determined that other jobs existed in the national economy that Erb could perform, including the positions of groundskeeper, janitor and automotive detailer. (Tr. 27). Accordingly, the ALJ found that Erb was not disabled. (*Id.*).

**B.      Erb's Contentions**

Erb contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 9). First, he challenges the ALJ's RFC assessment on the grounds that the ALJ failed to give appropriate weight to the opinion of Erb's treating physician and that his RFC analysis was not otherwise supported by substantial evidence. (*Id.* at 10-19). Next, Erb maintains that the ALJ failed to assess properly his credibility. (*Id.* at 19-22). Finally, he contends that the ALJ's step five determination is not based upon substantial evidence because the hypothetical posed to the vocational expert was based upon a flawed RFC analysis. (*Id.* at 23-25).

**II.      Analysis**

I turn first to Erb's contention that the ALJ's RFC assessment was flawed. An individual's RFC is his "maximum remaining ability to do sustained work activities in an

ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

   As an initial matter, the opinion provided by Yu that Erb was "totally disabled" and not capable of engaging "in any competitive employment" reflects a conclusion that is expressly reserved for the Commissioner. As such, and as noted by the ALJ, he was not obligated to accord significant weight to this portion of Yu's assessment. *See Osbelt v. Colvin*, 2015 WL 344541, *3 (W.D.N.Y. 2015) (physician's letter "which concluded that '[claimant] is unable to work in any significant capacity given ongoing emotional and physical limitations' . . . [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work" and thus amounted to a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted); *Wilferth v. Colvin*, 2014 WL 4924117, *3 (W.D.N.Y. 2014) ("[the doctor's] opinion . . . does not specify any particular limitation on plaintiff's capacity: it is no more than a conclusory opinion on the ultimate issue of disability, which is unquestionably a matter reserved to the Commissioner") (internal quotation omitted); *Thompson v. Colvin*, 2014 WL 7140575, *9

(D. Vt. 2014) (doctor's opinion that claimant was currently unable to work was not entitled to weight; "the opinion[] [is] conclusory and do[es] not list any practical functional consequences of [claimant's] mental impairments, stating merely that 'complications with anxiety, PTSD[,] and agoraphobia' have caused her to be unable to work"); *Emery v. Astrue*, 2012 WL 4892635, *6 (D. Vt. 2012) ("the ALJ was not obligated to afford significant weight to [the doctor's] conclusory opinion that [claimant's] impairments limited 'her ability to hold a full-time job'").

Erb argues that the ALJ improperly discounted the opinion provided by Yu on January 15, 2013. (Docket # 9-1 at 10-17). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)     the frequency of examination and length, nature, and extent of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010). The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992, *4

(W.D.N.Y. 2008). The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *See id.*

        The ALJ stated that he gave "some weight" to portions of Yu's opinion and found remaining portions to be unsupported or contradicted by the record. In doing so, he did adopt or account for many of the limitations assessed by Yu. For instance, the ALJ limited Erb to routine, unskilled work – consistent with Yu's opinion that Erb was able to comprehend and carry out simple instructions, but would have difficulty with detailed instructions – and required that Erb's contact with coworkers and the public be limited – consistent with Yu's opinion that Erb would have difficulty responding to supervision and was unable to respond appropriately to coworkers. (Tr. 14, 307-08). Further, the hypothetical that the ALJ posed to the vocational expert was limited to jobs that did not require quota work – consistent with Yu's opinion that Erb would not be able to handle production or demand requirements. (Tr. 84-85, 309).

        Although the ALJ clearly adopted some of Yu's limitations, Erb maintains that the ALJ's RFC assessment is flawed because he improperly rejected Yu's opinions that Erb had no useful ability to respond appropriately to coworkers, complete a normal workday on a sustained basis, or tolerate customary work pressures in a work setting. (Docket # 9-1 at 10). Additionally, Erb maintains that the ALJ improperly rejected Yu's conclusion that Erb was likely to be absent from work more than four days per month. (*Id.* at 11). I conclude that the ALJ failed to provide "good reasons" for his decision to assign limited weight to these portions of Yu's opinion. In his decision, the ALJ recognized that Yu was Erb's treating physician, but

accorded these opinions little weight because he found that they were inconsistent with Erb's "hearing presentation, level of activities and the record as a whole." (Tr. 26).

Having reviewed the decision, the record, and Yu's opinion, I conclude that the three grounds provided by the ALJ for rejecting portions of Yu's opinion do not constitute "good reasons." First, I agree with Erb that the ALJ's observations of a claimant during a hearing are entitled to limited weight and do not provide a basis for rejecting portions of Yu's opinion. The ALJ described Erb's hearing demeanor as "responsive, courteous and articulate." (Tr. 24). He then determined that Yu's opinion was inconsistent with Erb's hearing demeanor, but failed to explain the nature of the inconsistency. Indeed, a review of Yu's treatment notes demonstrates that Erb generally presented as "cooperative and friendly" and that his speech was coherent and relevant during his appointments with Yu. (Tr. 289, 293). Despite his friendly demeanor, Yu opined that Erb suffered from serious mental health issues and assessed significant work-related limitations, opining that Erb was unable to engage in competitive employment. (Tr. 307-10). That Yu would assess significant limitations despite describing a cooperative and friendly demeanor suggests the assessed limitations are not inconsistent with the demeanor observed by the ALJ during the hearing. In any event, without an explanation from the ALJ identifying the inconsistency, I am unable to evaluate whether Erb's hearing demeanor provided a sufficient basis for rejecting some of Yu's conclusions.

Further, although a claimant's "pattern of daily living" is an "important indicator of the intensity and persistence of [the claimant's] symptoms," *see* 20 C.F.R. § 416.929(c)(3), the ALJ failed to explain how Erb's activities were inconsistent with the opinions provided by Yu that were rejected by the ALJ. The ALJ noted that Erb was able to care for his personal hygiene, prepare his own meals, perform household chores and yard work, take public transportation, and

drive.  (Tr. 24).  According to the ALJ, Erb's ability to drive demonstrated an ability to sustain

concentration and attention.  (*Id.*).  This observation is also consistent with Yu's opinion that Erb

was able to carry out simple tasks and procedures.  (Tr. 307).  In my estimation, the remaining

activities identified by the ALJ are not necessarily inconsistent with Yu's opinions that Erb

would have difficulty responding appropriately to coworkers, completing a normal workday on a

sustained basis, tolerating customary work pressures, or maintaining adequate attendance.  Thus,

without further explanation from the ALJ, I fail to discern how Erb's activities justify rejection

of Yu's opinions.  *See Miller v. Comm'r of Soc. Servs.*, 2015 WL 337488, *22 (S.D.N.Y. 2015)

("[i]n giving 'little weight' to [treating physician's] opinion, the ALJ also reasoned that it was

'inconsistent with the extensive activities of daily living that the claimant was able to perform'[;]

. . . [s]uch a conclusory statement, which does not identify which activities are being referenced,

is insufficient to meet the ALJ's obligations to 'comprehensively set forth [the] reasons for the

weight assigned' to the opinion") (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

 Finally, the ALJ's statement that the rejected opinions were "inconsistent with the

record as a whole" is too conclusory to constitute a "good reason" to reject the treating

psychiatrist's opinions.  The ALJ does not identify anything in the record that is inconsistent

with Yu's opinions, and indeed the record contains evidence that is consistent with Yu's concern

about Erb's ability to sustain employment.  For instance, Erb's work history appears to suggest

that, despite having been hired for several positions, Erb has never been able to maintain a

position for an extended length of time.  (Tr. 59, 158-59).  Without identifying the alleged

inconsistencies in the record, the ALJ has failed to provide any basis for rejecting Yu's opinions.

*See Marchetti v. Colvin*, 2014 WL 7359158, *13 (E.D.N.Y. 2014) ("[u]nder the treating

physician rule, an ALJ may not reject a treating physician's opinion based solely on such

conclusory assertions of inconsistency with the medical record") (collecting cases); *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *2 (N.D.N.Y. 2014) ("this . . . conclusory statement about the treatment records fails to fulfill the heightened duty of explanation"); *Crossman v. Astrue*, 783 F. Supp. 2d 300, 308 (D. Conn. 2010) (ALJ's statement that treating physician's opinion was "inconsistent with the evidence and record as a whole," was "simply not the 'overwhelmingly compelling type of critique that would permit the Commissioner to overcome an otherwise valid medical opinion'") (quoting *Velazquez v. Barnhart*, 2004 WL 367614 at *10 (D. Conn. 2004)). Accordingly, I conclude that the ALJ failed to provide "good reasons" for rejecting Yu's opinions and remand is warranted. *See Halloran*, 362 F.3d at 33 ("[w]e do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion").

On remand, the ALJ should state his findings and provide good reasons for rejecting Yu's opinions, if he still does, considering the length, nature, and extent of the treatment relationship, the frequency of examination, the degree to which Yu's opinion was consistent with the record as a whole, whether Yu was a specialist in an area of medicine that related to one of Erb's impairments, and whether there were any other factors that "support or contradict" Yu's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416. 927(c)(2)-(6). Additionally, it does not appear as though all of the treatment records from Elmira Psychiatric Center were included in the record. For instance, although the records indicate that Erb attended therapy sessions with Underwood (Tr. 300), the treatment records reflecting those sessions are not in the record. Similarly, the records suggest that Erb met with Yu on August 1, 2011, but

that treatment note is not in the record. On remand, the ALJ is directed to re-contact the Elmira Psychiatric Center and request that they provide all records relating to Erb's treatment.

Erb also challenges the ALJ's RFC assessment on the grounds that he improperly relied on the opinions provided by Caldwell, the one-time examining psychologist, and Kamin, the non-examining psychologist, and formulated an RFC without explaining how it was supported by the medical evidence. (Docket ## 9-1 at 17-19; 12 at 2-3). Similarly, Erb challenges the ALJ's credibility analysis on the grounds that he failed to provide good reasons for discounting Erb's testimony and the statements provided by Erb's girlfriend and family. (*Id.* at 17-23). Finally, he challenges the ALJ's step five assessment because it was based upon an allegedly flawed RFC. (*Id.* at 23-25). In light of my determination that the ALJ erred in evaluating the opinion of Erb's treating physician, thus warranting remand, I decline to evaluate whether the ALJ erred in assessing plaintiff's RFC or credibility. *See Norman v. Astrue*, 912 F. Supp. 2d 33, 85 n.79 (S.D.N.Y. 2012) ("[b]ecause I find that remand is proper on the basis of the ALJ's failure to properly develop the record and to properly apply the treating physician rule, I do not reach plaintiff's arguments with respect to (1) the ALJ's determination of his RFC at step four and (2) whether the ALJ carried his burden at step five of the analysis[;] [t]he aforementioned legal errors cause the remaining portions of the ALJ's analysis to be inherently flawed"); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 268 n.14 (E.D.N.Y. 2010) ("[b]ecause the [c]ourt concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the [c]ourt need not decide at this time whether the ALJ erred in assessing plaintiff's credibility").

Although I do not reach Erb's challenges to the ALJ's step-five assessment, I do note that the hypothetical posed to the ALJ does not appear to correspond precisely to the RFC

assessed by the ALJ. During the hearing, the ALJ asked the vocational expert to identify positions for an individual who "could tolerate no more than occasional interpersonal contact if the individual would be working as part of any team." (Tr. 84). Yet, in the RFC assessment the ALJ indicated that Erb should not work as part of a team. (Tr. 23). Given the hypothetical posed to the vocational expert, it is unclear whether any of the identified positions would require teamwork. This should be clarified on remand.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Erb's motion for judgment on the pleadings **(Docket # 9)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 15, 2015